## UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF LOUISIANA
### LAFAYETTE DIVISION

**UNITED STATES OF AMERICA**            **CRIMINAL NO. 6:21-CR-00138**

**VERSUS**                              **JUDGE DAVID C. JOSEPH**

**BRIAN BROUSSARD (01)**                **MAGISTRATE JUDGE DAVID J. AYO**
**SHALLA ADAMS (02)**

### MEMORANDUM RULING

Before the Court are: (i) a MOTION TO SUPPRESS [Doc. 93]; and (ii) a SUPPLEMENTAL & AMENDING MOTION TO SUPPRESS [Doc. 102] (collectively the "Motion to Suppress") filed by Defendant, Shalla Adams ("Adams") in the above-captioned matter. The Government opposes the Motion to Suppress. [Doc. 106]. An evidentiary hearing was held on August 24, 2022, during which the Court took testimony from Corporal Joshua Maddox ("Cpl. Maddox") of the Lake Charles Police Department. For the following reasons, the Motion is DENIED.

### FACTS AND PROCEDURAL BACKGROUND

On February 9, 2021, Cpl. Maddox and his K-9 partner, Rambo, were performing drug interdiction and traffic enforcement on Interstate 10 ("I-10") in Calcasieu Parish, Louisiana. Around mile marker thirty-eight, Cpl. Maddox noticed a Dodge pickup truck ("truck") towing a single-car hauler, loaded with a Chevrolet Malibu. The truck and trailer were drifting back and forth in the lane, hugging the left side of the lane, and at times, going over the white dash-line marker. Cpl. Maddox also noted that the car being towed was a rental (the "rental car") and that it was being carried on a U-Haul trailer (the "trailer"). Based on the observed traffic

1

infractions, and suspecting possible narcotics trafficking,[1] Cpl. Maddox stopped the truck on the side of the interstate.

When Cpl. Maddox first approached the truck, he asked the driver, Myles Charles ("Charles"), to step out so they could speak away from traffic.  Cpl. Maddox explained the reason for the traffic stop and asked Charles a few questions about his travel.  Charles stated that he had picked up the rental car at an Albertson's parking lot in Lafayette, Louisiana, that morning.  He explained that he was taking the car to Texas for a friend, that he was getting paid in gas money, and that he had just met the passenger, Trenton Dartez ("Dartez"), that morning.  When asked by Cpl. Maddox where in Texas they were taking the rental car, Charles said "umm probably Pearland," but later stated he was taking the rental car to Houston.

Cpl. Maddox then went to the passenger side of the truck to get the insurance and registration.  There, Cpl. Maddox spoke with a nervous Dartez who was still in the passenger seat.[2]  When Dartez was asked the same questions about the pair's travel itinerary, Dartez said that he had been asked to help transport the rental car earlier that morning, that they were taking the rental car to Los Angeles, that he was getting paid $200 a day, and that he had been working with Charles for two weeks.

---

[1]     Cpl. Maddox testified that in his experience as a narcotics task force officer assigned to perform drug interdiction on Interstate 10, rental cars are often used to transport narcotics.

[2]     Dartez appeared so nervous when Cpl. Maddox approached him that he twice asked if he was "ok."  Cpl. Maddox found Dartez's behavior odd because Charles was driving and thus was the only one in jeopardy of receiving a traffic citation.  Cpl. Maddox testified that he had received training to observe the behavior of passengers during drug interdiction stops.

After hearing Dartez's conflicting itinerary, Cpl. Maddox again questioned Charles about his travel plans.  Charles added to his previous statement that he was transporting the car for a "friend" and getting paid in gas money, though his real business was running a "hotshot" business that transported freight.[3]  Charles also explained that his friend had the keys to the rental car and was flying to meet them in California to pick up the rental car.[4]

Cpl. Maddox then returned to his patrol car to perform a license, vehicle, and warrant check.  When everything came back clear, Cpl. Maddox gave Charles a notice of violation and asked Charles more questions about his travel plans.  When asked about the identity of the friend whose car they were towing, Charles said his friend's name was "Brian," but could not say Brian's last name or what he did for a living.  At this point, Cpl. Maddox asked if there were any narcotics or weapons in either of the vehicles.  Charles responded "no."  Cpl. Maddox then asked if there was any U.S. currency in the vehicles, to which Charles responded that there was nothing in the truck.  Cpl. Maddox then specifically asked if there was anything in the rental car. Charles repeated that there was nothing in the truck.

Cpl. Maddox then asked for and received verbal and written consent from Charles and Dartez to search the truck and the rental car.  Before obtaining signatures from Charles and Dartez on a written "consent form," Cpl. Maddox

---

[3]     Charles told Cpl. Maddox that he owns a trailer and has a "hotshot" business that usually hauls single loads of farm equipment or general freight.

[4]     During this conversation Charles also offered to show Cpl. Maddox the paperwork for the U-Haul trailer rental but did not offer to show him the paperwork for the rental car.

explained that the form authorized a search of the truck, trailer, and rental car and included the license plate numbers for all three vehicles on the consent form.[5]

Once he received consent to search the vehicles, Cpl. Maddox and other officers who had by then arrived at the scene began to search the truck.  When they could not find the keys to the rental car in the truck, they asked another officer to retrieve a tool kit to assist them in unlocking the door of rental car to perform a search.  Once the car door was unlocked, the officers discovered that they could not access the inside of the rental car because the trailer's fenders precluded them from opening the car doors.  The officers did not observe anything inculpatory inside the rental car at this time.

Having been stymied in their attempt to finish the search on the side of the interstate, Cpl. Maddox decided to bring the truck and trailer to the police station a few miles away so they could safely remove the rental car from the trailer and search it.  However, before re-locating the rig to the police station, Cpl. Maddox decided to conduct a free-air sniff of the truck, trailer, and rental car with Rambo.  Rambo alerted twice on the rental car, indicating the presence of contraband.

After Rambo's alert, Cpl. Maddox requested a two-man unit to help drive the truck and trailer to the police station.  Once the two-man unit arrived, one of the officers drove the truck while Charles and Dartez were separately transported to the

---

[5]      Cpl. Maddox testified that he believed he needed Charles' consent to conduct the search because he was in control of the rental car and had an agreement to transport it to its destination.  Moreover, based on prior instances where occupants had lied about who rented the car or having the keys, Cpl. Maddox testified that he believed the keys to the rental car were in the truck.

police station.  They reached the police station about ten minutes later and removed

the rental car from the U-Haul trailer.  Inside the rental car, the officers found: (i) a

rental agreement in the glove compartment with Adams' name on it; and (ii) a duffel

bag in the trunk containing $474,940.

On June 16, 2021, Adams was indicted in the Western District of Louisiana for

Conspiracy to Distribute and Possess with Intent to Distribute Controlled

Substances, in violation of 21 U.S.C. § 846; Possession of an Unregistered Silencer,

in violation of 26 U.S.C. § 5861(d); Possession of a Silencer Not Identified by a Serial

Number, in violation of 26 U.S.C. § 5861(i); Conspiracy to Commit Money

Laundering, in violation of 18 U.S.C. § 1956(h); Money Laundering, in violation of 18

U.S.C. § 1956(a)(1)(B)(i); and Engaging in Monetary Transactions with Property

Derived from Specified Unlawful Activity, in violation of 18 U.S.C. § 1957.

Adams filed the MOTION TO SUPPRESS [Doc. 93]; on July 15, 2022, and the

SUPPLEMENTAL & AMENDING MOTION TO SUPPRESS [Doc. 102] on August 15, 2022. The

Motion to Suppress contends that the money found in the duffel bag should be

excluded from evidence because: (i) the traffic stop was not based on any traffic

violation; (ii) the length of the traffic stop was unreasonable; (iii) the occupants lacked

the authority to grant consent to search the rental car; and (iv) the warrantless search

of the rental car was not supported by probable cause because the K-9 and his handler

were not certified at the time of the search and the alert was otherwise improper.

The Government filed an Opposition to the Motion to Suppress [Doc. 106] on August

22, 2022, arguing that: (i) Adams lacks standing to challenge the stop; (ii) Adams

lacks standing to challenge the search of the rental car; and (iii) the warrantless

search was lawful because it was supported by consent from Charles and Dartez as well as probable cause. The Court set this matter for evidentiary hearing on August 24, 2022.

At the hearing, Adams conceded that the initial stop was proper and acknowledged that she lacked standing to challenge the initial stop. In addition to the narrative of events described above, Cpl. Maddox testified to the following facts relevant to the Court's resolution of this Motion to Suppress:

(i)   Cpl. Maddox waited to run Rambo because he had consent from Charles and Dartez to conduct the search and because I-10 is dangerous for Rambo. He deploys him only when necessary.

(ii)  Cpl. Maddox attended a 120-hour course on narcotics detection with Rambo in 2018. Additionally, Cpl. Maddox and Rambo have conducted weekly training sessions since January of 2019 and annually re-certify through the National Police Canine Association ("NPCA").

(iii) Rambo is Cpl. Maddox's only partner.

(iv)  Cpl. Maddox and Rambo failed the NPCA certification on January 25, 2021, after Cpl. Maddox let Rambo conduct the test "off-leash," something he had not done during any prior certification. After they failed the test, the instructor told Cpl. Maddox the failure was "100 percent" handler error.

(v)   Cpl. Maddox and Rambo took the next available NPCA test and were re-certified in March of 2021.

(vi)  The NPCA, Rambo's certifying organization, does not test on fentanyl.

(vii) Rambo is trained to detect numerous narcotics, such as heroin, and is trained to detect residual odors.

(viii) Rambo had previously alerted during searches that resulted in heroin containing fentanyl.

(ix)  Based on Cpl. Maddox's training and experience with Rambo, and conversations with other K-9 officers, Cpl. Maddox believes Rambo has picked up fentanyl as an additional odor.

(x)    Because Rambo has transitioned from an "aggressive" alert dog to more of a "passive" alert dog, Rambo scratches or touches an area to indicate an alert.

(xi)   Other than the seizure at issue in this case, Cpl. Maddox has had two seizures with Rambo where he went under the rental car and alerted. Both yielded inculpatory evidence.

(xii)  On the instant occasion, Rambo alerted on the passenger side of the rental car twice.

The Court requested additional post-hearing briefs from both parties concerning the legal basis for Adams' standing, if any, to challenge the length of the stop and the search of the rental car. In response, the Government filed a POST-HEARING MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS on August 31, 2022, [Doc. 111], and Adams filed a POST-HEARING MEMORANDUM on September 7, 2022, [Doc. 116]. The Motion to Suppress is now ripe for ruling.

## LAW AND ANALYSIS

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., Amend IV. Searches conducted without a warrant are "per se unreasonable…subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). Defendants bear the initial burden of establishing that their rights have been violated. *See United States v. Antone*, 753 F.3d 1301, 1306 (5th Cir. 1985) (citing *United States v. Salvucci*, 448 U.S. 83, 86 (1980)). If they meet this burden and, as here, the search was conducted without a warrant, the burden then shifts to the government to show than an exception to the warrant requirement applies. *Coolidge*

*v. New Hampshire*, 403 U.S. 443, 445 (1971). Thus, here the Court must resolve whether Adams' Fourth Amendment rights are implicated and, if so, whether the search of the rental car was justified by an applicable exception to the warrant requirement.

## I.     Standing

As an initial matter, the Court must address whether Adams has standing to assert that the extension of the stop and search of the rental car violated her Fourth Amendment rights.   In weighing whether a criminal defendant has standing to challenge a search or seizure, it is the defendant that bears "the burden of establishing [her] right to contest a search or seizure of a person or property." *United States v. Antone*, 753 F.3d 1301, 1306 (5th Cir. 1985) (citing *United States v. Salvucci*, 448 U.S. 83, 86 (1980)).

### a.  The Traffic Stop

An automobile stop is considered a seizure under the Fourth Amendment. *United States v. Grant*, 349 F.3d 192 (5th Cir. 2003) (citing *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S. Ct. 1391, 59 L.Ed.2d 660 (1979)).  Thus, "[t]he protection of the Fourth Amendment 'extends to vehicle stops and temporary detainment of a vehicle's occupants.'" *United States v. Reyes*, 963 F.3d 482, 487 (5th Cir. 2020) (quoting *United States v. Andres*, 703 F.3d 828, 832 (5th Cir. 2013)).

It is well-established that the "Fourth Amendment protects people, not places," and that these rights "may not be vicariously asserted." *Katz v. United States*, 389 U.S. 347, 352 (1967); *Alderman v. United States*, 394 U.S. 165, 174 (1969) (citations omitted).  As such, Fourth Amendment rights may only be enforced by persons whose

own rights have been violated.  *Carr v. Hoover*, 837 Fed.Appx. 279. 282 (5th Cir. 2020)

(citing *United States v. Phillips*, 382 F.3d 489, 495 (5th Cir. 2004)).

Here, Adams was not in the rental car when it was stopped and was neither

"seized" during the stop nor "detained" prior to the search.  Thus, Adams' Fourth

Amendment rights were not violated, and she lacks standing to challenge either the

traffic stop or the length of the occupants' subsequent seizure.[6]  Accordingly, the

Court denies Defendant Adams' Motion to Suppress on that basis.

### b.  The Search of the Rental Car

To challenge the validity of a search under the Fourth Amendment, a

defendant must prove a "constitutionally protected reasonable expectation of

privacy." *Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576

(1967) (Harlan J. Concurring).  A defendant has a reasonable expectation of privacy

if he or she has a "subjective expectation of privacy in the object of the challenged

search" *and*, can show that "society [is] willing to recognize that expectation as

reasonable." *California v. Ciraolo*, 476 U.S. 207, 211 (1986).

---

[6]     Even if Adams did have standing, the Court finds that Cpl. Maddox had reasonable suspicion to extend the stop based on the inconsistent stories from Charles and Dartez, Dartez's nervous behavior, and Cpl. Maddox's anomalous observation that a U-Haul trailer was being used to tow a rental car. *See, United States v. Reyes*, 963 F.3d 482 (2020) (holding that officers had reasonable suspicion to extend a stop based on inconsistent stories from the driver, the fact that the driver drove a truck registered in someone else's name, which in the officer's experience was often to avoid forfeiture, a prior conviction for possession of meth, and strange answers to whether there was anything illegal in the truck. *Id*. at 488-89); *United States v. Young*, 816 Fed.Appx. 993 (2020) (holding that there was reasonable suspicion to extend a traffic stop because the driver did not know if she was coming from "Manvel" or "Mandel," the driver's explanation for her travel did not make sense, she appeared nervous, and had three prior charges or convictions for marijuana. *Id*. at 996).

Here, Adams alleges that she has standing to challenge the search of the rental car because she was listed on the rental agreement.  In support of her claim, Adams cites *United States v. Blaze.*  [Doc. 93 p. 4].  In *Blaze*, a three-judge panel of the Tenth Circuit Court of Appeals held that a defendant who leased a rental car, but was not present when the vehicle was stopped, did not have standing to challenge the search of the car, but did have standing to challenge the search of a locked briefcase located inside the vehicle's trunk.  *Id.* at 591 (10th Cir. 1998).  There, the defendant who leased the rental car personally placed a locked briefcase in the trunk and instructed two of his associates to drive the car to California where they would meet him.  *Id.* at 588.  The car was stopped by police on the way and officers searched the vehicle, including  the defendant's locked briefcase.  *Id.* at 588-89.  The court specifically held that by "surrender[ing] the car to his friends…[the defendant] abandoned his privacy interest in the car as a whole" and, therefore, did not have standing to challenge the search of the car.  *Id.* at 591.  The court noted, however, that the defendant had standing to challenge the search of the locked briefcase.  *Id.* The court reasoned that the defendant had a reasonable expectation of privacy in the briefcase because the briefcase was locked, the trunk was locked, and the man "specifically entrusted it to his associates." *Id.*

Adams' argument appears to apply the *Blaze* court's standing analysis with respect to the locked briefcase to her standing claim challenging the search of the rental car.   Even if this were the proper analysis, the case *sub judice* is distinguishable.  First, Adams placed her belongings in a duffel bag, not a locked briefcase.  Second, Adams has not presented any evidence that she entrusted the

rental car or the duffel bag to known associates. Additionally, as the Government points out, Adams has not presented any evidence indicating how the rental car ended up in the possession of Charles and Dartez.  Finally, other than the fact that her name was on the rental agreement, Adams has failed to present evidence to indicate what steps, if any, she took to maintain a privacy interest in the rental car.  There is no evidence, for example, that Adams personally placed the duffel bag in the trunk, that she took any step steps to secure the duffel bag, or that she maintained possession of the keys to the rental car.

Moreover, Fifth Circuit precedent holds that a defendant who owns a vehicle, but is not driving it when it is seized, does not have standing to challenge the vehicle's search because he does not have a reasonable expectation of privacy in the vehicle. *United States v. Nunn*, 525 F.2d 958, 959 (5th Cir. 1976).  Accordingly, the Court finds that because Adams was not driving when the rental car was searched, but rather had surrendered the rental car to the custody of a third-party, she did not have a reasonable expectation of privacy and lacks standing to challenge the search of the rental car.  The Motion to Suppress may be denied on this basis alone.

## II.   Fourth Amendment Analysis

Because Adams lacks standing to challenge the rental car's search, it is not necessary to go further for purposes of ruling on the Motion to Suppress.  Even so, having conducted an evidentiary hearing and reviewed applicable precedent, the Court also finds it clear under the facts presented that the rental car's search did not run afoul of the Fourth Amendment.

As a starting point, the Court notes that it is fundamental that a search conducted without a warrant is "per se unreasonable…subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967).  Where there is a warrantless search, the government bears the burden of establishing an exception to the warrant requirement. *Coolidge v. New Hampshire*, 403 U.S. 443, 445 (1971).

In this case, the Government submits that the search of the rental car was lawful because it was a consensual search and because it was supported by probable cause under the automobile exception to the warrant requirement.  The Court agrees.

III.   **The Consent Exception**

It is "well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).  Adams alleges that the consent from Charles and Dartez was invalid because they did not have the authority to grant consent to search the rental car.

Voluntary consent to search can be obtained either from the individual who owns the property, "or from a third party who possesses common authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) (citations omitted).  When a person consents to the search of property owned by another, the consent is valid if "the facts available to the officer at the moment…warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." *Id.* at 188 (quoting *Terry v. Ohio*, 392 U.S. 1, 23-22 (1968)).  A consenting third party must have either, actual authority, meaning they "'mutually used the property

12

searched and had joint access to and control of it for most purposes,'" or apparent authority, which "would require proof that the searching officers 'reasonably (though erroneously) believe[d] that the person who has consented to their' search had apparent authority to do so." *United States v. Jaras*, 86 F.3d 383, 389 (5th Cir. 1996) (citations omitted).

In *United States v. Jaras*, the Fifth Circuit held that the warrantless search of a passenger's suitcases violated the Fourth Amendment because the driver did not have authority to consent to the search of the passenger's property. *Id.* There, the officers received consent from the driver to conduct a search of the car. *Id.* at 386. When the officers got to the trunk, however, the driver told the officers that the bags in the trunk were the passenger's, not his. *Id.* The officers then told the passenger that because they had permission from the driver to search the car, they could search his bags. *Id.* The passenger neither consented nor objected to the search of his bags. *Id.* The Fifth Circuit reasoned that the consent was not valid because the officers were not given consent from the passenger, knew that the driver did not have joint access or control over the passenger's bags, and could not claim to "erroneously" believe that the bags belonged to the driver when they obtained the driver's consent to search the car. *Id.* at 390. Additionally, the Fifth Circuit noted that the consent from the driver "extended to a search of the vehicle itself," including the trunk, but not the passenger's luggage. *Id.* at 389.

Conversely, in *United States v. Navarro*, the Fifth Circuit held that the search of luggage located in a vehicle was valid because the consent form granted the police general consent to search the *entire* vehicle, including the luggage, because the police

did not know to whom the luggage belonged. *United States v. Navarro*, 169 F.3d 228, 232 (5th Cir. 1999). The Fifth Circuit further reasoned that the consent was valid because, although there were numerous passengers, there was no indication that the bag did not belong to the driver who granted consent, the luggage was in the back seat, and neither the driver nor the passengers objected to the search. *Id.*

Here, unlike *Jaras* and *Navarro*, Adams challenges the search of the trunk of the rental car, not the search of the duffel bag. Importantly, both the *Jaras* and *Navarro* Courts acknowledged that the consent to search the car, including the trunk, was valid. Moreover, like the officers in *Navarro*, Cpl. Maddox did not know to whom the rental car belonged, neither Charles nor Dartez objected to the search, and both provided verbal and written consent. Thus, it was likely reasonable at the time of the search for Cpl. Maddox to believe Charles and Dartez had rented the car because they were in possession of it and because of their inconsistent stories about why and where they were hauling it, and for what purpose. Their consent therefore was likely valid based on "the facts available to the officer at the moment" of the search. *Illinois v. Rodriguez*, 497 U.S. at 188 (1990).

Nonetheless, regardless of whether Cpl. Maddox had valid consent to search the rental car, as discussed below, the automobile exception to the warrant requirement applies and the search was supported by probable cause.

### a. The Automobile Exception

Under the automobile exception, police may conduct a warrantless stop and search of a vehicle if they have probable cause to believe the vehicle contains contraband or other evidence of a crime. *United States v. Ross*, 456 U.S. 798, 799

(1982) (citing *Carroll v. United States*, 267 U.S. 132, 158-59 (1925)).  The automobile

exception is a well-recognized exception to the warrant requirement and is justified

"by the mobility of vehicles and occupants' reduced expectations of privacy while

traveling on public roads." *United States v. Beene*, 818 F.3d 157, 164 (5th Cir. 2016).

Probable cause for a search pursuant to the automobile exception is determined by

the totality of the circumstances.  *Illinois v. Gates*, 462 U.S. 213, 238 (1982).

Here, Adams alleges that the search of the rental car was not supported by

probable cause because: (i) Rambo was not certified at the time of the search; (ii) the

duffel bag only tested positive for fentanyl, a substance Rambo is not certified in; and

(iii) that Rambo's alert was insufficient because it was "apparently observable" only

to Cpl. Maddox.

The Court is informed in its analysis of these issues by the United States

Supreme Court case of *Florida v. Harris*. 568 U.S. 237 (2013).  There, the defendant

alleged that a dog's alert was insufficient to give an officer probable cause to search

because the dog was not certified at the time of the search, and because the search

did not yield in any substances in which the dog was trained, but rather ingredients

commonly used to make methamphetamine.  *Id.*  Rejecting this argument, the *Harris*

Court held that a dog's alert is enough to establish probable cause when "all the facts

surrounding [the] dog's alert, viewed through the lens of common sense, would make

a reasonably prudent person think that a search would reveal evidence of a crime."

*Id.* at 248.

At Harris' hearing on his motion to suppress, the K-9 officer testified that he

and the dog each attended a 160-hour course in narcotics detection, attended

"refresher courses," and conducted weekly training sessions. *Id.* Additionally, the officer was asked about his certification that had expired the year before the search occurred. *Id.* at 242. The trial court denied motion but was reversed by the Florida Supreme Court, who held that in addition to training and certification records, the state needed to introduce more documentary evidence, such as field performance records, to establish probable cause. *Id.*

The Supreme Court disagreed, finding that requiring the state to provide such "comprehensive documentation…is the antithesis of a totality-of the circumstances analysis." *Id.* at 245. The Court noted in its ruling that a dog's alert provides a presumption of probable cause to search if "a bona fide organization has certified a dog…[and that] the same is true, even in the absence of formal certification." *Id.* at 246-47. The Supreme Court emphasized, however, that the defendant has the right to challenge the reliability of the dog as well as the dog's alert. *Id.* 248. The court then must weigh the evidence and analyze the facts surrounding the alert considering the totality of the circumstances. *Id.*

In this case, Adams first alleges that because Cpl. Maddox and Rambo were not certified at the time of the search, the alert by Rambo is "entirely unreliable." [Doc. 116, p. 5]. Similar to the officer and dog in *Harris*, Cpl. Maddox and Rambo had attended a 120-hour course on narcotics detection and had conducted weekly training sessions together for more than three years. Additionally, Cpl. Maddox testified that he and Rambo have run numerous searches in the field, and that Cpl. Maddox has not conducted a search based on an analogous alert from Rambo that did not result in the seizure of contraband.

Moreover, unlike *Harris*, where the officer and dog had been uncertified for a year, Rambo had been uncertified for less than a month when the search occurred and was re-certified soon thereafter.  Cpl. Maddox testified that Rambo did not pass the January 25, 2021, re-certification because he allowed Rambo "off-leash" during the test, something he had never done before, and that his failure was pure "handler error."  The Court finds Cpl. Maddox's explanation for the lapse in certification credible and does not find that Rambo's alert was inherently unreliable simply because he was not certified at the time of the search.

Next, Adams claims that Rambo's alert was unreliable because the duffel bag only tested positive for trace amounts of fentanyl, a substance Rambo is not certified to detect.  Because, among other things, "we do not evaluate probable cause in hindsight, based on what a search does or does not turn up," the Court finds this argument unpersuasive.  *Id.* at 249.  By way of explanation, however, Cpl. Maddox testified that he believes Rambo picked up fentanyl as an additional scent based on his previous alerts to heroin mixed with fentanyl and that he has had conversations with other K-9 officers who have had similar experiences with dogs picking up scents beyond their formal training.[7]

Finally, Adams challenges Rambo's alert because it was "apparently observable" only to Cpl. Maddox and that "deputies on the scene, or at least the trainees" did not see the alert.  [Doc. 102, ⁋ 13].  At the hearing, Cpl. Maddox testified that Rambo is more of a passive alert dog, that he generally scratches or touches spots

---

[7]        Cpl. Maddox testified that Rambo cannot be certified by the NPCA in fentanyl because fentanyl is not currently one of the substances tested by the NPCA.

as an alert, and that he alerted twice on the rental car.  Additionally, Cpl. Maddox testified that he is Rambo's only handler, they have worked together for three years, and that Rambo has never falsely alerted under similar circumstances.  The Court finds Cpl. Maddox's testimony credible.  Given these facts, the Court finds there is sufficient evidence that Rambo's behavior on February 9, 2021, was indicative of the presence of contraband in the rental car.

Though a "dog sniff" alone is sufficient to establish probable cause for a search under most circumstances, here there is more.  As reaffirmed in *Harris*, "[a] police officer has probable cause to conduct a search when 'the facts available to [him] would warrant a [person] of reasonable caution in the belief' that contraband or evidence of a crime is present'." *Id.* at 243 (citations omitted).  Here, in addition to the alert from Rambo, Cpl. Maddox: (i) noticed the anomalous situation of a rental car being towed on a U-Haul trailer; (ii) was told by Charles and Dartez that they were towing the rental car for their friend "Brian," though neither could provide his last name; (iii) was told by Charles that he was traveling to Texas, only getting paid in gas money, and had met Dartez earlier that day; and (iv) was told by a visibly nervous Dartez that he was traveling to California, getting paid $200 a day, and had been working with Charles for two weeks.  The Court finds that these facts, taken together with the alert from Rambo, establish probable cause for the search and that the automobile exception to the exclusionary rule therefore precludes suppression of the resulting evidence.

## CONCLUSION

For the foregoing reasons, the Court DENIES the Motion to Suppress [Docs. 93, 102].

THUS, DONE AND SIGNED in Chambers on this 30th day of September 2022.

_____
DAVID C. JOSEPH
UNITED STATES DISTRICT JUDGE